# CHARLESTON.

## DYER *v.* DUFFY *et al.*

Submitted January 24, 18 4.—Decided March 28, 1894.

1. PRINCIPAL AND AGENT—SALE—POWER OF ATTORNEY.

     Where one by writing empowers another to sell land, implying

a cash-sale, and the agent simply transfers the writing to a third person, without payment of purchase-money, this is not a sale.

2. PRINCIPAL AND AGENT—SALE—POWER OF ATTORNEY.
A mere proposal to sell land does not become a sale until accepted, and notice of acceptance given the proposer.

3. PRINCIPAL AND AGENT—SALE—OPTIONS.
In unilateral contracts, called options, the time fixed for acceptance is of the essence of the contract.

4. PRINCIPAL AND AGENT—SALE—POWER OF ATTORNEY.
A power of attorney may fix a limit of time within which the agent is to do the act. Where it fixes a reasonable time for doing the act, it must be done by the agent within a reasonable time, in order to bind the principal. A proposal of sale made under such power must be accepted within a reasonable time from the date of the power.

5. PRINCIPAL AND AGENT—SALE—POWER OF ATTORNEY.
One dealing with an agent acting under written power is taken to deal with the power spread out before him, and must inspect it to see whether the agent's act is authorized by the power.

6. PRINCIPAL AND AGENT—SALE—POWER OF ATTORNEY. ·
One dealing with a special agent does so at his peril. He must be careful to see that the agent's authority covers the act he does.

7. PRINCIPAL AND AGENT—SALE—POWER OF ATTORNEY.
An agent appointed by parol to sell land can not receive purchase-money, unless so authorized by his power.

8. PRINCIPAL AND AGENT—SALE—POWER OF ATTORNEY.
A power of attorney merely to sell land implies that the agent shall sell for cash, and he can not sell on credit in the absence of authority contained in such power of attorney.

9. SPECIFIC PERFORMANCE.
Specific performance being addressed to the sound discretion of the court, the party asking it must have been ready, willing, and prompt in · the performance of those things incumbent on him, and where he has not been so, and it would impose hardship and be inequitable upon the other party, specific performance will be refused.

J. H. FERGUSON, for appellants.

BROWN, JACKSON & KNIGHT, for appellee.

BRANNON, PRESIDENT:

This is a chancery suit of E. B. Dyer against P. F. Duffy and others in the Circuit Court of Kanawha county, by

which Dyer sought to compel J. N. Camden and George W. Curtin to convey to him certain lands on Grassy creek and Elk river in Webster county. The decree compelled Camden and Curtin to make such conveyance, and they appeal.

In response to a letter from Duffy, not in the record, the nature of which we can only glean from the reply, Camden wrote the following letter:

"Parkersburg, W. Va., April 30th, 1888.

"P. F. Duffy, Esq., Charleston, W. Va.

"Dear Sir :

"Your favor of the 17th instant received, stating that if I will give you an option for a short time on the Elk and Grassy creek lands in Webster county, you think you can sell the same for one dollar per acre. I will be glad to sell at one dollar an acre and will confirm any sale you make to that effect within a reasonable time. I will also sell you the lands at seventy five cents (75) per acre, if you conclude to take them yourself and will let me know about it soon·

"Yours, very truly,

"J. N. Camden."

Upon it is this indorsement, made May 8, 1888 : "I hereby transfer the within to E. B. Dyer.

"P. F. Duffy."

Camden afterwards sold and conveyed the land to Curtin.

A question which at once presents itself is : Has Dyer any right to the land such as he can enforce against Camden, irrespective of the rights of Curtin? If he has not, he can succeed against neither. The letter of Camden to Duffy presents two legal features. The one makes Duffy Camden's agent to sell his land; the other makes a proposal to sell the land to Duffy. Let us look at it in the first aspect. When Duffy indorsed on the letter, "I assign the within to E. B. Dyer," what did he assign? It is vague and uncertain. He could not assign the agency—the power to sell for Camden—since an agent without power of substitution in his authority can not assign his power. Story, Ag. § 13.

But it is said that Duffy, as agent for Camden, under the

first clause, sold the land to Dyer. May we not as well or more plausibly say that, taking only the assignment, it relates to the personal right of Duffy? But does this assignment purport to be an act of agency or of sale? It does not purport to be the act of Camden by Duffy, his agent. When an agent does an act for his principal, he must in some way indicate that it is the act of a principal by an agent. We have to annex the letter to the assignment, it is true; but still it remains indefinite, whether it is an attempted subrogation of Dyer to Duffy's power to sell, or an assignment of his own right to purchase, or a sale as agent. It contains not a word importing a present sale of land. It gives no terms. Where no terms are fixed, cash is implied, I know; but I use this argument to show that it is straining the act and implying a sale to treat these few words of assignment as a sale. If the parties intended it as a final act of sale, would they not have made a more definite instrument? It seems likely that Duffy gave it simply to authorize Dyer to find a purchaser. Dyer did set about seeking a purchaser, tending to show that he did not regard himself then a purchaser. If he and Duffy intended by the assignment to make a final sale, would we not expect that Duffy would require cash, as Camden's letter would legally import, or that, if on credit, they would fix terms of credit? Would Dyer risk his purchase without either paying or seeing to terms of credit?

Dyer set about seeking a purchaser until, having found one, as he thought, he concluded to consummate a purchase and on October 13, 1888, deposited in bank, to Duffy's credit, the purchase-money. His action indicates that he did not regard himself a purchaser by mere force of the assignment, as he risked no money on it.

There is another consideration repelling any idea that we can hold Dyer a purchaser on the date of the assignment. Camden's letter gave no credit. Dyer paid not a dollar down. He took, if Duffy did not give, nearly six months' credit, and Duffy had no authority to make a credit sale, and such a sale would not bind Camden. One dealing with an agent under written power deals with that power before him, and Dyer did have this letter before him

and took it into possession. One dealing with an agent under written power must take notice of his powers, as an act not authorized is not binding on the principal. *Curry* v. *Hall*, 15 W. Va. 867; *Hewes* v. *Doddridge*, 1 Rob. (Va.) 143; *Stainback* v. *Read*, 11 Gratt. 281. Duffy was a special agent to sell particular land, not a general agent, and those dealing with a special agent do so at their peril as to his authority. 2 Kent. Comm. 621; Story Ag. § 126. A sale on credit would not bind Camden, as under a mere power to sell land, not authorizing credit, the agent can not sell on credit. 1 Pars. Cont. 58; *Burks* v. *Hubbard*, 69 Ala. 367; *Delafield* v. *Illinois*, 26 Wend. 192; *School Dist.* v. *Aetna Ins. Co.*, 62 Me. 330; *Lumpkin* v. *Wilson*, 5 Heisk. 555; 1 Am. & Eng. Enc. Law, 360; 2 Kent. Comm. 622; Story, Ag. § 77. The deposit of purchase-money in bank was no payment to Camden, as it was deposited to Duffy's credit, and, as the power to Duffy was only a parol power to sell, he could not receive purchase-money. *Mann's Ex'r* v. *Robinson*, 19 W. Va. 49. An agent empowered by seal to sell or sell and convey for cash, or perhaps to sell and convey merely, may receive the money; but if the power is by parol, and does not expressly authorize the agent to receive the money, or, though under seal, provides for a credit, he can not receive it. If, without payment, there had been a consummated binding contract, this would not be material. Duffy had a silent, undefined interest in the land, but the money going to Camden was separately his, and Duffy's interest would not authorize him to receive it.

Another reason against compeling Camden to specific performance of the alleged sale is, that he empowered Duffy to sell "within a reasonable time." The assignment was in a reasonable time; but it could not alone constitute a sale. No money was paid nor terms of credit provided for. If we treat this assignment as a finished sale, we must call it, as between agent and purchaser, a credit—unauthorized by the power, not binding Camden, he being ignorant of it. I use this as a circumstance against any theory, that this assignment made a sale. It is the only act within a reasonable time; the act of deposit, the next act, not being

within a reasonable time. I do not mean, that under the letter Duffy could not within a reasonable time make a proposal to sell to be accepted within a reasonable time, or that, if so accepted, payment was essential to the birth of a contract; for I think that such a proposal, so accepted, would make a contract, and Dyer need not pay until he received a deed, unless payment were made an essential element of acceptance—a condition precedent to the birth of a contract.

If we say that the deposit in bank was an act of payment under the sale made by the assignment, it came too late, because, as an act constituting an essential part of the sale, treating it as an election by Dyer to take the land, it was not within the reasonabe time required by the letter of Camden, and because that required a payment to Camden, not a deposit to Duffy's credit, he having no authority to receive; and because, if it had even been deposited to Camden's credit, it would not be good, unless with notice of the deposit he waived money-payment; and because also Camden had no notice whatever of such deposit, until he had sold the land to another—until indeed this suit was brought. But it will be said that Duffy knew of this deposit. That makes no difference. His power as agent ended months before with the supposed sale. He had no power in regard to payment of the money and of course his knowledge as to that would not bind Camden, as the doctrine that notice to an agent is notice to his principal applies only to a matter as to which he is agent. If Dyer relied upon such deposit to Duffy's name, he should have notified Camden himself of it.

The assignment alone is thus no sale and gives Dyer no right. But, though the force of the assignment arises in the case, I do not understand that it is claimed that it alone is a contract, but the origin of what finally by the deposit became a contract. The action of Dyer speaks his construction of this indefinite assignment. It has been well-said by Sugden. "Tell me what you have done under a deed, and I will tell you what that deed means." Dyer did not pay or offer a dollar at the date of the assignment. He went about seeking a purchaser, probably on specula-

tion. When he had found one, not before, he deposited the purchase-money.

In his evidence he treated Camden's letter as an offer by Camden to sell and said he accepted it, and when asked if, "at the time you made said deposit and accepted the offer, did you have any notice of a withdrawal of Camden's offer?" thus treating the deposit as the acceptance, he says, when he made the deposit, he asked Duffy to have the deed made, again treating the deposit as his acceptance. He says that certain obstacles existed in the way of confusion of land titles in Webster and finding papers to give chain of title and boundaries of these lands, and that he would consider six months a reasonable time to consummate the sale.

His evidence in the respects named, and in other respects in its drift and spirit, shows that Dyer construed the matter to this effect, namely: That by the letter Camden made a proposal to sell; that by his assignment he, Dyer, became not at once a purchaser, but entitled to become such, should he thereafter choose to do so; and that by depositing the purchase-money in bank to Duffy's credit, with notice to Duffy of the deposit, he became a full purchaser, entitled to call for a deed. Let us then, so treat it. What aspect does it present? A proposal by Camden, through his agent, to Dyer. Camden's proposal required a consummated sale within a reasonable time. Both clauses of his letter speak an intent not to give long time to effect a sale, but to require promptness. It was an option to purchase, a proposal—as the letter itself calls itself an "option"—and under the language of the offer, as well as the general law of contracts touching a proposal, it must be accepted, and acceptance made known, and within a reasonable time. *Weaver* v. *Burr*, 31 W. Va 736 (8 S. E· Rep. 743); *Barrett* v. *McAllister*, 33 W. Va. 738 (11 S. E· Rep. 220); *Hanly* v. *Watterson, supra* p. — (19 S. E. Rep. 536); Whart. Const. § 9; Bish. Const. § 327. A mere option to purchase vests no right until accepted. *Stembridge* v. *Stembridge's Adm'r*, 87 Ky. 91 (7 S. W. Rep. 611); *Bostwick* v. *Hess*, 80 Ill. 138.

In case of unilateral contracts, called options, as the ob-

ligation is, before acceptance, on one side only, the proposer being bound to comply with his proposal, while the other party is under no obligation, and under no peril until acceptance, the provision of the offer as to time of acceptance is viewed with strictness. Fry, Spec. Perf. § 733; *Harding* v. *Gibbs*, 125 Ill. 85 (17 N. E. Rep. 60). In such contracts the doctrine, often stated, that time is not of the essence of the contract, does not apply; that doctrine applies to contracts when made, not to offers to make them. In case of proposals, time is of the essence as to acceptance. *Stembridge* v. *Stembridge's Adm'r*, 87 Ky. 91 (7 S. W. Rep. 611); *Longworth* v. *Mitchell*, 26 Ohio St. 334; *Barrett* v. *McAllister*, 33 W. Va. 738 (11 S. E. Rep. 520); *Weaver* v. *Burr*, 31 W. Va. 736 (8 S. E. Rep. 743). See valuable collection of authorities on subject of options generally in notes to *Litz* v. *Goosling* (19 S. W. Rep. 527); 21 Lawy. Rep. Ann. 127.

Shall we say, that nearly six months was a reasonable time merely to make an election to accept or reject? Surely not. The mere general statement, that titles in Webster were confused, without specification or suggestion of any defect as to this land, and that there was some delay in getting boundaries, offers no adequate excuse for delay. He must accept or reject the offer sooner. Camden might want to sell himself, or to get another to sell, or to have the benefit of a period when the timber lands are saleable, and not tie himself down to one proposal for so long a time that the period would pass away. It seems certain that Dyer wanted to buy only in the event he could find a purchaser, and could not sooner do so. Camden was not required to wait for this. Time will cancel and withdraw a proposal as effectually as express withdrawal with notice, if acceptance be unduly delayed. Bish. Cont. § 327; 1 Whart. Cont. §§ 9, 15.

Camden waited four months without a hint from Duffy or Dyer of the assignment of his letter to Dyer, or that Dyer had any idea of buying, and then himself sold the land to another with Duffy's written consent spoken of below; and it is now proposed to enforce a proposal or option not accepted for nearly six months.

Take the second clause of the letter. Its effect arises in the case, and is before us, but it seems not to be relied upon. It is only a proposal by Camden to sell to Duffy, if he would communicate an acceptance soon. Both under the law and the language of this offer, it was no sale until Duffy accepted, and made known his acceptance to Camden. *Weaver* v. *Burr*, 31 W. Va. 736 (8 S. E. Rep. 743); *Barrett* v. *McAllister*, 33 W. Va. 738 (11 S. E. Rep. 220); *Watson* v. *Coast*, 35 W. Va. 462 (14 S. E. Rep. 549.) It vested no interest in the land. *Stembridge* v. *Stembridge's Adm'r*, 87 Ky. 91 (7 S. W. Rep. 611); *Bostwick* v. *Hess*, 80 Ill. 138. Never did Duffy accept it. Therefore, if the intent was to assign his personal right of purchase, it is abortive, because Duffy had no interest in the land to transfer to Dyer. Could he assign the right to accept ? He could not, because it was a personal right to Duffy to buy at a certain price, whereas a sale to another was fixed at a higher price; and it was a mere option, and that before acceptance seems to be nonassignable. There is nothing to assign. It is no contract until acceptance, and a man may rely on the honesty, solvency and promptness of one but not of another. *Sutherland* v. *Parkins*, 75 Ill. 338; Warv. Vend. 187, 188; *Weaver.* v. *Burr*, 31 W. Va. 736; (8 S. E. Rep. 743); *Barrett* v. *McAllister*, 33 W. Va. 736 ; (11 S. E. Rep. 220) ; *Watson* v. *Coast*, 35 W. Va. 462 (14 S. E. Rep. 249).

The earliest act of acceptance would be October 13, 1888, when Dyer deposited in bank the purchase-money. This was too late. The letter of option expressly limited Duffy's acceptance by the word "soon." Who will say that five and a half months was soon ? Soon means promptly and, also, by it Duffy was to let Camden know of his acceptance soon. Dyer never informed Camden of this deposit. He did not know of it until this suit was brought, nor of any acceptance by Duffy or Dyer ; and the deposit was to Duffy's credit, not Camden's. Under this second clause, what earthly right would Duffy have to receive the money? None, he being the purchaser. Duffy knew of the deposit; but, of course, that was no notice of acceptance to Camden; for, under this clause, Duffy could not be agent and purchaser. And, moreover, an agent appointed by

parol to sell can not receive purchase-money. *Mann's Ex'r v. Robinson*, 19 W. Va. 49.

Thus a review of the case in all its material bearings leads to the conclusion, that Dyer had no enforceable contract. Duffy joins in an answer with Camden and Curtin denying utterly any such sale in fact or law. If any one could give a clear statement on this matter, Duffy is that one. Why did not the plaintiff put him on the stand to attest the sale? The burden is on the plaintiff to prove a sale and remove obscurity from this obscure transaction, and Duffy is the very man, who, as the plaintiff says, conferred his right. Dyer says, that, when he made the deposit, he requested Duffy to have Camden make a deed, and he thinks Duffy said he had requested Camden to make a deed. Why not prove this by Duffy? Why not prove by Duffy, if such was the fact, that Camden was informed of the assignment and of the deposit and approved it and so waived the delay? Camden swears that he did not know of the assignment of his letter by Duffy to Dyer until the date of his deposition in this suit—June 15, 1892—and was given no information of any negotiation between Duffy and Dyer, and none of the deposit by Dyer. Why not prove the reverse by Duffy, after Camden's evidence called for such proof, if the contrary was true? Dyer in October, after the deposit, sent B. W. Byrne to Camden to see about a deed. Did Byrne tell Camden of the assignment and deposit? We do not know. Byrne, the agent chosen by Dyer for this mission, is not called by him to prove those or any facts.

I have above sought to show that, tested by principles of law, Dyer never had any enforceable contract for the purchase of these lands. But suppose we treat that vague, uncertain act of assignment of Camden's letter by Duffy to Dyer as creating a contract to sell to Dyer. Then I say, that on the merits a court of equity ought not to enforce it. Specific performance rests in the sound discretion of the court under all the circumstances. He who asks it must have done those things required of him. Say that the assignment operated as a sale, or say that it was a proposal as Dyer himself viewed it, giving him right to buy, if he

thereafter should elect to do so. Neither he nor Duffy informed Camden of it until the last of October through Byrne, if he did then. He did not do any act of payment or election to take the land until his deposit in bank, October 13th. He never informed Camden of this election or deposit. If the assignment be treated as a sale, it was Dyer's duty at once to offer to pay Camden, and get his deed. He did not do so.

If we regard the assignment as only a proposal giving Dyer right to purchase thereafter, it was Dyer's duty on electing to consummate to seek Camden and offer to·pay him on delivery of a deed. He did not do so. He deposited the money to Duffy's credit, he having no right to receive, and this nearly six months after the date of proposal, and then did not notify Camden. He knew, too, before he made the deposit, that C. P. Dorr, who purchased the land of Camden for Curtin, was in actual negotiation with Camden for the land, and yet never informed Camden, that he, Dyer, had the assignment from Duffy or had any negotiations with Duffy, but allowed Camden and Dorr to go on and close. His own interest, if he then regarded himself a purchaser, or as having right to become such, as also justice to Camden, called upon him to let Camden know of his rights and claim. But he allowed Camden to go on and close the sale to Dorr by a deed to Curtin binding Camden by general warranty. It looks like Dyer had yet not made up his mind to buy. Curtin paid for the land and obtained his deed in ignorance of any claim by Dyer. Would it be right for a court of equity to compel Camden to make good his warranty, and Curtin lose his land, under such circumstances of delay, indecision, and negligence on the part of Dyer.

In determining whether it will exercise its discretion in favor of specific performance, equity must regard the conduct of the parties. Curtin is an innocent purchaser without fault. I do not see that any imputation can be cast on Camden's conduct in the matter. He would have received more money by accepting Dyer's deposit than what he received from Curtin. He had right to expect that, if anything would be done under his letter to Duffy, it would be

done promptly, and he so provided in it, and that he would not be month after month kept in ignorance of what did take place under it. And, when Dorr approached Camden on the subject of buying the land, he told Dorr that there were reasons why he could not sell him the land without Duffy's consent, and that he must see Duffy and obtain his consent; and afterwards Dorr presented Camden a letter from Duffy, dated August 25, 1888, saying that he gave Dorr privilege to buy his interest in the lands (it appearing that Duffy had some silent interest in them); and in a few days after the date of this letter Camden sold the land to Dorr.

Now, would not Camden, knowing nothing whatever of any assignment of his letter to Dyer, or any negotiations between Duffy and Dyer, conclude that Duffy contemplated no action under that letter, and that it was at an end? It does not appear that Dyer knew of the letter from Duffy to Camden. I refer to it, however, as a pertinent circumstance, tending to show that Camden's action was in good motive, and not such as to place him under the condemnation of a court of equity when deciding whether to give or withhold relief against him. I do not at all intend to have it even inferred that any reflection of bad motive or purpose lies at Dyer's door. All we say is that, whatever his right, he made his election too late, and was not in any respect diligent to protect his right. Courts of equity will not exercise jurisdiction in specific performance where it would impose hardship on people not censurable in conduct, and where the circumstances and condition of things have so changed as to make it work loss and hardship to them. *Bowles* v. *Woodson,* 6 Gratt. 78; *Booton* v. *Scheffer,* 21 Gratt. 474; *Clay* v. *Deskins,* 36 W. Va. 350 (15 S. E. Rep. 85).

Our conclusion is to reverse the decree, and dismiss the bill.